JOSEPH BAGLIO *vs.* NEW YORK CENTRAL RAILROAD COMPANY.

Suffolk.    December 7, 1961. — March 21, 1962.

Present: WILKINS, C.J., SPALDING, WILLIAMS, WHITTEMORE, & SPIEGEL, JJ.

*Damages,* For personal injuries, Mitigation.    *Estoppel.    Limitations, Statute of.    Practice, Civil,* Charge to jury.

On the issue of mitigation of damages in an action for personal injuries there was error in a charge which might have led the jury to think that whether the plaintiff was obliged to submit to an operation as a suitable means of improving his condition was to be determined by the subjective test of the plaintiff's own judgment of the matter rather than the objective test of the judgment of the ordinary reasonable person.    [18–19]

In an action under the Federal Employers' Liability Act against a railroad by its employee for injury to his knee, for which he was under the care of the defendant's doctor for some four years, a finding that the defendant was estopped to rely on the three year statute of limitations was warranted by evidence that a few months after the injury a claim agent of the defendant told the plaintiff "we will take care of you," that, following an operation on the knee performed by the doctor, another claim agent of the defendant on two occasions shortly before the expiration of the period of limitation and again shortly after its expiration told the plaintiff that when the doctor "released" him "we will settle" the claim, that by reason of the agents' statements the plaintiff had no thought of bringing action, and that when the doctor finally "released" him at the end of the four years and he sought a settlement the claim was denied on the ground of the statute, whereupon he immediately consulted an attorney and brought the action.    [19–20]

There was error prejudicial to a party in a portion of the charge in an action in that the judge misstated testimony of an important witness for that party as to a certain fact, told the jury not to be "misled" by his testimony and thereby reflected on his credibility, and told the jury what was the fact in question contrary to G. L. c. 231, § 81.   [20]

Tort.   Writ in the Superior Court dated April 1, 1959.

There was a verdict for the plaintiff at the trial before *Swift,* J., and the defendant alleged exceptions.

*Frank W. Crocker,* (*George T. Finnegan* with him,) for the defendant.

*Roger J. Donahue,* for the plaintiff.

Williams, J.   This is an action of tort under Federal Employers' Liability Act, 45 U. S. C. (1958) §§ 51–60, brought on April 1, 1959, to recover for an injury incurred on April 30, 1955, in the yard used by the defendant at Everett.   The defendant pleaded the three year statute of limitations, § 56, and the plaintiff's contributory negligence. The plaintiff filed a replication to the plea of the statute alleging that the defendant by its own fraud was estopped to raise the statute.

There was evidence that the plaintiff was a car inspector for the defendant and was injured while attempting to close a door of a freight car by his foot sinking into the soil of the yard.   His right knee was injured.   The accident was in the morning of April 30, 1955, and that afternoon his knee "locked" so that his wife and son had to assist him in straightening his leg.   It was a type of "locking" that required traction or manipulation to reduce.   He reported his injury and was referred to Dr. Kallan, the defendant's physician.   The doctor diagnosed the injury as a sprain of the knee.   On May 19 on learning that the knee was locking he diagnosed it as a ruptured cartilage.   During 1955 the plaintiff saw Dr. Kallan six or eight times.   About the first of July he saw one Fish, the claim agent for the railroad. After he had given Fish a statement of what had happened, Fish said, "All right, if you lose time, we will pay the medical bills, doctor's bills, and, if you lose time, when it comes time that you come up here to settle your claim, we will take care of you."   The plaintiff worked through 1956 and 1957,

during which period his knee locked several times with resulting pain. He saw Dr. Kallan more than six times. In 1958 his knee locked twice and, on February 26, it locked and could not be straightened out. He went to the hospital, where Dr. Kallan operated on his knee. In the first week of March, one Borst of the defendant's claim department came to see him in the hospital accompanied by a clerk. Borst said that he was there in reference to the plaintiff's injury and that he did not have all the facts and wanted the plaintiff to repeat them. The conversation was taken down by the clerk. The plaintiff said, "Sir, what's the story on my claim here?" Borst said, "We will take care of your hospital and doctors, and when you're ready to go back to work again you can come up, and we will settle the claim"; that Dr. Kallan was to keep treating him and when Dr. Kallan released him he would go back to work. Borst called him up about the beginning of April and asked about his treatment and going back to work. The plaintiff told him that the doctor had not told him when he could go back to work and had not released him. Borst said, "When the doctor releases you, let me know. You come up here, and we will settle your claim." In June, Borst called again and, when the plaintiff told him that his knee still ached and the doctor had not released him, repeated, "When the doctor releases you, let me know. You come up here, and we will settle your claim."

The plaintiff returned to his regular work in September but saw Dr. Kallan regularly. The doctor finally released him in March, 1959. He called Borst about April 1 and told Borst that he had been released by the doctor. He said, "I am calling you now so we can make an arrangement to come up and see you to settle my claim." Borst said, "You have no claim against the Company . . . [t]he statute (sic) of limitations run out." The plaintiff then consulted an attorney for the first time.

The plaintiff testified that when he saw Dr. Kallan on May 1 or 2, 1955, the doctor told him that from the X-rays he had a torn cartilage and that "eventually I would have

to be operated on'' and ''[e]ventually you might have to have an operation.'' He answered, ''Well, let me think about it.'' The doctor did not again bring up the subject of an operation. Up to the time he talked with Borst in 1959 he did not know of any legal requirement for bringing suit at a particular time and he intended to wait until his injuries were cleared up before talking about settlement. He had no intention of filing suit at any time, because the claim agents had told him that when the doctor released him they would take care of his claim.

Dr. McGillicuddy, an orthopedic surgeon called by the plaintiff, testified that a ruptured semilunar cartilage of the knee will heal without an operation unless it is torn many times; but, if it cannot be reduced and locks about ten times or more, surgery may be necessary. On redirect examination, he said that the fact that Baglio was operated on in February of 1958 rather than in May or June of 1955 probably meant there was more damage to the knee than had he been operated on in 1955 because in the period of two or three years the cartilage locking would cause injury to the joint. On cross-examination, he testified that, if the plaintiff had six lockings in 1955 and six in 1956 with pain almost continually, it would indicate that the cartilage was torn and an operation at that point would be ''wise treatment.'' It would be a ''major operation'' but not a serious one as on the belly or chest.

A motion of the defendant for a directed verdict was denied and the jury returned a verdict for the plaintiff in the sum of $18,000.

The defendant does not argue that the jury could not have found the defendant negligent in failing to provide a safe place to work but contends there were errors by the judge in dealing with the duty of the plaintiff to mitigate his damages and with the effect of estoppel on the right of the defendant to raise the statute of limitations.

The plaintiff testified that Dr. Kallan told him that he had a torn cartilage and eventually would or might have to have an operation; that he answered, ''[L]et me think about

it''; and that the doctor did not bring up the subject again until the operation in February, 1958. Dr. Kallan testified that on May 26, 1955, he advised the plaintiff that an operation be performed and the latter said he would take it under consideration. The plaintiff worked during 1956 and 1957 and continued under the treatment of Dr. Kallan whom he saw from first to last some fifty-nine times.

The general rule as to mitigation of damages is stated in *Ouillette* v. *Sheerin,* 297 Mass. 536, 543: ''[I]f the condition of a person claiming damages would be improved by having an ordinary operation which a reasonably prudent man in the circumstances would submit to, a refusal would be evidence of an unreasonable failure to lessen the amount of damages, but . . . a person is not obliged to have a serious surgical operation when the outcome as to relief and the reduction of damages is uncertain; . . . such a person has the obligation to be reasonable with respect to having an operation and to exercise the care in effecting a cure and diminishing damages which a person of ordinary prudence would exercise in like circumstances.'' See *Floccher's Case,* 221 Mass. 54; *Snook's Case,* 264 Mass. 92; *Sheppard's Case,* 287 Mass. 459; *Noyes* v. *Whiting,* 289 Mass. 270; *Degener* v. *Gray Line, Inc.* 331 Mass. 133, 133–134; *Lewis* v. *Pennsylvania R.R.* 100 F. Supp. 291, 294.

At the conclusion of the evidence the defendant asked the judge to instruct the jury that ''The plaintiff has the legal obligation to take all reasonable steps to reduce the damages to which he may be entitled as a result of his injuries.'' The judge failed to grant this request and two others, which stated with substantial accuracy the applicable law, and charged: ''The [p]laintiff . . . must do what is reasonably necessary to recover the condition of his health which he enjoyed before the. accident. Whether or not he is obliged to undertake an operation on his own body is for the [j]ury to determine, and it's a matter for the individual who is to be operated on to determine that question. He may have the benefit of advice. He may have suggestions from those who are trained in surgical and medical fields, but, after all

is said and done, it's the individual that is to be operated on.''

This instruction was erroneous. It left with the jury the idea of a subjective test whereby the obligation of the plaintiff to submit to an operation was dependent on the exercise of his individual will and not on what would be the judgment of the average reasonable person in like circumstances.

There was no error in denying the defendant's motion for a directed verdict and submitting the question of an estoppel to the jury. Estoppel is an equitable doctrine which is available to meet a defence founded on the statute of limitations. *McLearn* v. *Hill*, 276 Mass. 519, 525. It does not require proof of actual fraud but may be found when '' '. . . one has been induced by the conduct of another to do something different from what otherwise would have been done and which has resulted to his harm and that the other knew or had reasonable cause to know that such consequence might follow. . . .' '' *McLearn* v. *Hill, supra*, p. 524.

It could be found that the plaintiff by reason of the medical care which the defendant had afforded him had confidence that he would be well treated when it came to the settlement of his claim. He did not think of having to bring suit. He was told first by Fish that when it came time to settle his claim, ''[W]e will take care of you.'' Later while in the hospital Borst told him that when released by the doctor, ''[W]e will settle the claim.'' The plaintiff's right to bring suit would expire on April 29, 1958. At the beginning of that month Borst called him up, asked about going back to work and said, ''When the doctor releases you, let me know . . . and we will settle your claim.'' The promises of the two claim agents amounted to representations that they intended to settle the claim and warranted the plaintiff in believing that a genuine effort would be made to effect a settlement.

We think that, if the jury believed that the defendant's agents made the statements attributed to them, they could properly find that the plaintiff was thereby induced to re-

frain from taking legal action.   See *Hayes* v. *Gessner,* 315
Mass. 366; *Knight* v. *Lawrence,* 331 Mass. 293, 295, and
cases cited; *MacKeen* v. *Kasinkas,* 333 Mass. 695, 698;
*LaBonte* v. *New York, N. H. & H. R.R.* 341 Mass. 127, 131.

The defendant's requests for instructions relating to the
doctrine of estoppel could properly have been granted, but
we think their refusal was not reversible error.   An exami-
nation of the charge as a whole shows that the jury were
correctly advised of the legal principles involved.

We are concerned, however, with a portion of the charge
which the defendant contends constituted a charge upon the
facts and was prejudicial to it on the issue of estoppel.
The witness Borst testified that the railroad had a group
insurance policy to cover medical bills for occupational acci-
dents and that under this policy the railroad would pay
part of the medical bills and be reimbursed by the insurance
company to the extent of its policy.   He said that he could
not recall how much in excess of $338 the railroad paid for
the plaintiff's operation or the amount reimbursed by the
insurer.   The judge charged, ". . . don't be misled by the
fact that the claim agent said, 'We will take care of the
medical bills.   We will pay the medical expenses.'   The in-
surance company is the one that paid it."   The defendant
urges that this statement does not accurately state the evi-
dence, constitutes a statement of fact contrary to G. L.
c. 231, § 81, and was a reflection on the credibility of Borst
whose testimony was vital to the defendant's case on the
issue of estoppel.   We are inclined to agree.   The use of
the word "misled" would naturally be considered by the
jury as suggesting that Borst had consciously misstated the
facts and was a witness not worthy of belief.   *Cahalane* v.
*Poust,* 333 Mass. 689, 694, and cases cited.

The exception of the defendant to the judge's charge on
mitigation of damages, and also its exception to the portion
of the charge which we have just discussed are sustained.

*Exceptions sustained.*