Walbert, Appellant, *v.* Farina.

Argued September 13, 1962. Before RHODES, P. J., ERVIN, WRIGHT, WOODSIDE, WATKINS, MONTGOMERY, and FLOOD, JJ.

*Charles H. Weidner,* with him *David J. Batdorf,* and *Stevens and Lee,* for appellant.

*George R. Eves,* for appellee.

OPINION BY ERVIN, J., November 15, 1962:

The plaintiff, Esther E. Walbert, as administratrix of the estate of her deceased husband, Robert R. Walbert, brought an action in trespass under the Survival and Wrongful Death Acts, against the defendant, Jerome Farina. The jury rendered verdicts for the plaintiff in the amounts of $1,500.00 in the survival action and $2,762.23 in the wrongful death action. The surviving spouse, Esther E. Walbert, was the only person entitled to recover damages in the wrongful death action. Plaintiff filed motions for a new trial limited to damages only or, in the alternative, to a new trial generally. Upon the dismissal of the motions and the

entry of judgment on the verdicts, the plaintiff took these two appeals.

Appellant's position is that the jury found the appellee to be liable and that the amount of damages awarded to her was inadequate. It is settled law of this Commonwealth that "Where the evidence of negligence or contributory negligence, or both, is conflicting or not free from doubt, a trial judge has the power to uphold the time-honored right of a jury to render a compromise verdict, and to sustain a verdict which is substantial—. . . ." *Karcesky v. Laria*, 382 Pa. 227, 114 A. 2d 150; *Padula v. Godshalk*, 192 Pa. Superior Ct. 618, 623, 624, 161 A. 2d 919.

The grant or refusal of a new trial for inadequacy of the verdict is a matter for the sound discretion of the trial court, whose action will not be reversed except for a clear abuse of discretion: *Elza v. Chovan*, 396 Pa. 112, 152 A. 2d 238; *Sherman v. Manufacturers L. & H. Co.*, 389 Pa. 61, 132 A. 2d 255.

"The refusal of a new trial sought because of alleged inadequacy of the verdict is a matter peculiarly within the discretion of the trial court, and the appellate court will not reverse unless the verdict is so unreasonable as to bring conviction that it was influenced by partiality, passion, or prejudice, or by some misconception of the law or evidence in the case." *Mohler v. Worley*, 179 Pa. Superior Ct. 56, 116 A. 2d 342. See also *Krusinski v. Chioda*, 186 Pa. Superior Ct. 419, 142 A. 2d 780; *Simpkins v. Richey*, 192 Pa. Superior Ct. 46, 159 A. 2d 17; *Salemmo v. Dolan*, 192 Pa. Superior Ct. 51, 159 A. 2d 253.

With these principles of law in mind, let us consider the evidence which was produced in this case. On December 1, 1957, at about 4:15 a.m., the weather being clear and dry, the decedent, Robert R. Walbert, age 49, was involved in an automobile accident in the 500 block of North 10th Street, Reading, Pennsylva-

nia. North 10th Street was a one-way street north with parking on both sides but leaving two lanes for traffic. The two lanes were divided by a broken line in the center of the street. Mr. Walbert had been out to a club in the company of two ladies, one of whom was Mrs. Florence Schleifenheimer, a widow. Mr. Walbert was driving Mrs. Schleifenheimer to her home at the time of the accident, the accident having taken place approximately in front of her residence at 541 North 10th Street, which is on the east side of the street. Mrs. Schleifenheimer was the only "eye witness" who testified for the plaintiff. She testified that Mr. Walbert partially backed his 1950 Buick automobile into a parking space between 535 and 537 North 10th Street. Her testimony is as follows: "Q. And what happened then? A. Well, he was parking his car and he had the car all but in, well, the front part of the car about two or three feet, which he would have been in to the curb, and this crash occurred. Q. You mean that the left front part of the car was out beyond the line of any parked cars about what? How many feet? A. About two or three, because he just had to make another turn to get in to the curb. Q. When you say another turn what do you mean? A. To swing in to bring him in. Q. To turn the wheels to the right? A. To the curb on the east side. . . . Q. Now at the time the collision occurred was the Walbert automobile moving or standing still? A. It was at a standstill. Q. It was? And do you know how long it was still before the crash? A. Well, the way I figured, half a second. MR. EVES: No, no, I object to that. THE COURT: Objection sustained. If you know you know, if you don't you don't know. THE WITNESS: I do know. That is what I said. BY MR. WEIDNER: Q. How long was the automobile—A. I do know half a second we would have been in to the curb. Q. How long was it standing still before the collision occurred? A. Oh, not long. Q. How long, if you know? A. Maybe a minute or so."

Mrs. Schleifenheimer did not see the defendant's car either before or after the accident. She did testify as to a statement made by Mr. Walbert immediately after the collision and which was properly admitted as part of the res gestae. She testified that the decedent said: "Oh, my stomach, oh, my stomach." He then fell over on to Mrs. Schleifenheimer's lap and said: "Oh, Florence, that is a terrible feeling to see somebody come down at a terrific rate of speed and can't get out of his way."

One eyewitness testified for the defendant. William J. Sands, who was following the defendant's automobile in his own automobile, both of which he said were traveling north on the western half of 10th Street, testified as follows: "A. Well, soon after I passed Green or got into the five hundred block of North Tenth Street, I see a car up ahead maybe two-thirds of a block, with the front end sticking partly out. Q. Now that car was, you say, two-thirds of the way through the block? A. Right. Q. And the front end of it was sticking out. What do you mean by that? A. The car wasn't parked the same as all the other cars were, the front end of it was sticking out into the right lane of traffic. Q. And on which side of the street was that car? A. On the right-hand side. Q. And when you saw it was it stopped or was it in motion? A. When I first saw it it was stopped. Q. And from the time you saw it did you see and observe whether or not it had lights on? A. No, I don't think it did. Q. Now then, did you continue to watch that car? A. Yes. Q. And what happened? A. Well, as we got closer this car pulled out from the right side of the street, where he was parked sticking part way out, and shot across. MR. WEIDNER: Objected to, if the Court please, as a conclusion. I ask that that be stricken, 'it shot'. THE COURT: Objection overruled, exception for the plaintiff. BY MR. EVES: Q. All right, go ahead. The car, you

said, shot out? A. It shot out and crossed on an angle across Tenth Street, and the next thing I saw, I saw Mr. Farina's brake lights light and just that quick he hit him, because he was clean across the street on an angle. Q. At the time that that car left that stopped position on the right or east side of North Tenth Street, do you recall, or can you tell us approximately how far the front of the Farina car was away from it? A. At the time he started to come out, I would say maybe, maybe two car lengths at the most. Q. Then you saw the brake lights of Mr. Farina's car go on, and then was there an impact? A. There was. Q. Did you see what part of Mr. Farina's car and what part of this other car came together? A. The right front of Mr. Farina's car hit the left middle of the other car. Q. And then what happened to these two vehicles? A. Well, the Farina car bounced around and the other car was pushed back to the right, up against a parked car. Q. And you say the other car was pushed, you mean that it was moved from the point in the street where it was struck over to the east, or the west side of North Tenth Street, right or left? A. To the right side. Q. Did it come to rest then against some other vehicle? A. Yes. Q. And when you say the Farina car bounced around, what do you mean by that? A. Well, when he hit him on the angle, just hitting him with the one side of his car, I suppose it was because he braked, he just bounced around to the front of the other car. Q. Can you describe the course that the Farina car took after it came into contact with the car that came across the street? Now it bounced around, what did it do after that? A. It went just a little bit north and turned towards the right side of the street, over to the east. Q. When it came to a stop then was it parallel with the street, or at an angle? A. It was almost across the street with the front end of it facing more to the east than to the west. Q. More to the east than to the west?

A. Oh, yes, it was almost due east. Q. And the car which it struck, was its position parallel to the line of parked cars that it had come up against? A. Just about. Q. Now as you proceeded north on Tenth Street, and this car came out from the area which you described, can you tell us the angle approximately that the car, course that the car took across Tenth Street from the right side to the left side? A. I would say it was about a 45 degree angle."

The defendant also testified that the accident happened in the manner described by Mr. Sands.

Under these conflicting versions, the negligence of the defendant and the contributory negligence of the decedent are not free from doubt. The court believed, and we agree, that these were compromise verdicts. The wrongful death action resulted in a verdict of $2,-762.23, which were the out-of-pocket expenses, and the survival action resulted in a verdict of $1,500.00. The testimony clearly indicates that the plaintiff, Esther E. Walbert, and her deceased husband, had had difficulties and that on the weekend of this accident, the plaintiff had gone to Philadelphia on a shopping trip and for the purpose of seeing the Army-Navy football game. Further, the plaintiff testified that her husband, the decedent, was in the habit of seeking social pleasures on his own and that he frequently stayed out to three, three-thirty or four o'clock in the morning and that in addition, on the Saturday before this accident, her husband had removed his clothes from the marital domicile to an address on Spring Street and that this had occurred without the knowledge of the plaintiff. The jury very well might have concluded that the plaintiff and her husband had separated and that she might not receive very much in the future from his earnings had he lived.

Counsel for the plaintiff also complains about a reference to the defendant's acquittal on a charge of

involuntary manslaughter arising out of the same facts with which we are here concerned. In general, judgments of acquittal in criminal cases are not admissible as evidence of the fact that a party in a civil action did not cause the loss: *Shoup v. Mannino,* 188 Pa. Superior Ct. 457, 461, 149 A. 2d 678; *Bobereski, Adm., v. Insurance Co. of Pa.,* 105 Pa. Superior Ct. 585, 161 A. 412.

In the present case the plaintiff, over the objection of the defendant, introduced the evidence of a police officer to the effect that the defendant was intoxicated and this evidence, if believed, would have established a degree of intoxication unfitting the defendant to drive. This evidence was relevant: *Fisher v. Dye,* 386 Pa. 141, 125 A. 2d 472; *Wentworth v. Doliner,* 399 Pa. 356, 160 A. 2d 562. On cross-examination the police officer was asked whether the defendant was indicted, tried and acquitted on the charge of involuntary manslaughter. Before he could answer the question the plaintiff objected and moved for the withdrawal of a juror. The court ruled as follows: "THE COURT: A juror will not be withdrawn. I think it is a very improper question. Whether Mr. Farina was acquitted by a jury in involuntary manslaughter has nothing to do with the case. This case is based on the testimony you hear, arguments, and the charge of the court. You will forget the last question." From the above it will be clear that the question was never answered and no record of the acquittal was offered in evidence. It should also be recalled that verdicts were rendered for the plaintiff in substantial amounts. We do not believe that the compromise verdicts rendered in this case were brought about because of a consideration of this matter by the jury but rather because of a consideration of the conflict in evidence as to how the accident actually happened. The action of the court in sustaining the objection to this evidence was proper in our opinion. We also believe that the refusal to withdraw a juror

was a proper exercise of discretion by the trial judge. A motion to withdraw a juror is addressed to the sound discretion of the trial judge and it is only where there is a clear abuse of such discretion that the court below will be reversed: *Com. v. Schumann,* 162 Pa. Superior Ct. 330, 333, 57 A. 2d 425; *Com. v. Petrosky,* 194 Pa. Superior Ct. 94, 109, 166 A. 2d 682.

Several other alleged trial errors were raised by counsel for the appellant but we believe they were all properly answered by the court below and do not merit any further discussion by us in this opinion.

Judgments affirmed.

RHODES, P. J., MONTGOMERY and FLOOD, JJ., dissent and would grant a new trial generally.